[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-12715

_____

LIBERTY SURPLUS INSURANCE CORPORATION,

Plaintiff-Counter Defendant-Appellee,

*versus*

KAUFMAN LYNN CONSTRUCTION, INC.,

Defendant-Counter Claimant-Counter Defendant-Appellant,

UNITED GLASS SYSTEMS CORP.,

Defendant.

_____

No. 23-12835

_____

LIBERTY SURPLUS INSURANCE CORPORATION,

Plaintiff-Counter Defendant-Appellant,

*versus*

KAUFMAN LYNN CONSTRUCTION, INC.,

Defendant-Counter Claimant-Counter Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:22-cv-80203-DMM

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN and MARCUS, Circuit Judges.

JORDAN, Circuit Judge:

These consolidated appeals require us to (1) decide whether an insured has standing to seek reformation before it makes a claim on the portion of the policy that it wants reformed, (2) construe an exclusion in a commercial general liability policy under Florida law,

and (3) determine whether the district court properly denied the insured's motion for attorney's fees.  We set out the relevant facts and then turn to these issues.

## I

These appeals come to us in a summary judgment posture. We therefore view the record in the light most favorable to Kaufman Lynn Construction, the non-movant. *See Taxinet Corp. v. Leon*, 114 F.4th 1212, 1231 (11th Cir. 2024).  The relevant facts, however, are generally undisputed.

JM Family Enterprises hired Kaufman to build its new corporate campus in South Florida.  The campus was to consist of three office buildings, a training and conference center, a sports and recreation building, a dining hall, an amphitheater, a central energy plant, a parking garage, and various landscaping and water features. To insure itself and its subcontractors, Kaufman obtained a commercial general liability policy from Liberty Surplus Insurance.

Kaufman finished construction on the energy plant and obtained a certificate of completion for the parking garage on March 12, 2020.  It received certificates of occupancy for the office buildings and the dining hall on October 9, 2020.  JM Family then relocated its employees from the old campus buildings and began using the new buildings.

On November 8, 2020, Tropical Storm Eta hit South Florida, causing water to leak into the completed buildings and resulting in about $3.3 million in damage.  At this time, construction of the

additional buildings and the demolition of the old buildings had yet to be completed.[1]

Days after the storm, JM Family informed Kaufman that it was responsible for mitigating the damage.  Kaufman filed a lawsuit in Florida state court against several of its subcontractors, including United Glass Systems, alleging that their faulty work contributed to the water damage.

Kaufman also initiated the claims process with Liberty, seeking indemnification for the water damage.  Liberty asserted that coverage was barred by the policy's Course of Construction Exclusion ("COCE"), which states that coverage does not apply to "[a]ny 'property damage' at or to any project insured under this policy during the course of construction until the project is completed." D.E. 96-1 at 45.  Kaufman disputed this conclusion, but Liberty ultimately denied and closed the claim in November of 2021.

Liberty then filed a declaratory judgment action in the district court against Kaufman and United Glass Systems, seeking a "declaration that the [COCE] extinguishe[d] Liberty's duty to defend or indemnify . . . any . . . party, from the claims asserted" in Kaufman's underlying state-court action. Kaufman filed counterclaims for declaratory relief and breach of contract, seeking to recover the money it spent mitigating the water damage.  Kaufman

---

[1] JM Family had decided not to build the training and conference center and the sports and recreation building, both of which had been included in the initial plan.

also asserted a counterclaim for reformation of the insurance policy due to mutual mistake. According to Kaufman, the policy's project description differed from the description that it had provided to Liberty when it bound the policy—the policy omitted several structures and failed to note that the project was to proceed in two phases. The district court dismissed Kaufman's counterclaim for declaratory relief as duplicative of Liberty's claim for declaratory relief. Following discovery, Liberty and Kaufman each moved for summary judgment on all claims.

The district court granted Liberty's motion for summary judgment on its claim for declaratory relief, concluding that the water damage was not covered by the policy because the COCE excluded coverage until the entire project was completed. Based on this determination, the court ruled that Kaufman's counterclaim for breach of contract was moot. *See Liberty Surplus Ins. Corp. v. Kaufman Lynn Constr., Inc.*, 658 F. Supp. 3d 1239, 1248–50 (S.D. Fla. 2023). In a separate order, the court later dismissed Kaufman's reformation counterclaim for lack of standing.

## II

We first address whether Kaufman has Article III standing to assert its counterclaim for reformation. That is a legal question subject to plenary review. *See I.L. v. Alabama*, 739 F.3d 1273, 1278 (11th Cir. 2014).

## A

The district court ruled that Kaufman lacked Article III standing to seek reformation. It reasoned that Kaufman had failed

to demonstrate a cognizable injury because (1) it was not pursuing an insurance claim for any of the structures purportedly omitted from the policy; and (2) even if the policy were reformed to include a phased description of the project and all of the structures involved, this would not change its conclusion that the COCE excluded coverage for the water damage.  The court also explained that Kaufman was not actually injured by any extra premiums it paid for the omitted structures; if it had actually been harmed it would have sought a refund of premiums for the omitted structures rather than reformation of the policy. The court further suggested that the reformation claim could also fail for lack of ripeness because Kaufman might not face hardship if adjudication was withheld.

Article III's standing requirements apply to state-law claims brought in federal court. *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019). "The standing inquiry focuses on whether the plaintiff is the proper party to bring t[he] suit, although that inquiry often turns on the nature and source of the claim asserted[.]" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citations and internal quotation marks omitted).  As explained below, we think the district court misunderstood the nature of a reformation claim under Florida law, and as a result incorrectly ruled that Kaufman did not suffer a cognizable injury under Article III.

Reformation serves "to judicially reconstruct a written agreement to conform to the intentions of the parties." *Smith v. Royal Auto Grp.*, 675 So. 2d 144, 153 (Fla. 5th DCA 1996).  In Florida

parties historically sought reformation in actions in equity rather than actions in law to enforce a contract. *See Schor v. Indus. Supply Corp.*, 173 So. 2d 710, 711 (Fla. 3d DCA 1965) (describing a distinct action in equity to reform a contract).

"A court of equity has the power to reform a written instrument where, due to a mutual mistake, the instrument as drawn does not accurately express the true intention or agreement of the parties to the instrument. A mistake is mutual when the parties agree to one thing and then, due to either a scrivener's error or *inadvertence,* express something different in the written instrument." *Fed. Ins. Co. v. Donovan Indus., Inc.*, 75 So. 3d 812, 814–15 (Fla. 2d DCA 2011) (citation omitted and emphasis in original). And reformation can "correct[ ] a mutual mistake in the description of the premises or articles insured due to the fact that in the case of a mere mutual mistake in the description of the subject matter equity will correct it to conform to the intention of the parties." 2 Couch on Insurance § 27.55 (3d ed. & Nov. 2024 update). *See, e.g., Springfield Fire & Marine Ins. Co. v. Martin*, 77 F.2d 492, 493 (5th Cir. 1935) (affirming decree in equity reforming an insurance policy to correctly describe the structure being insured).

Under Florida law, after reforming a contract a court "may retain jurisdiction and proceed to enforce the contract . . . so that full and complete justice may be administered." *Capital City Bank v. Hilson*, 60 So. 189, 195 (Fla. 1912). But an action to reform an insurance policy can be brought even if there is no underlying claim on the policy to resolve. In the words of one respected

treatise on contracts: "In contrast to the rules for avoidance, the party seeking [reformation] need not show [that] being adversely affected by the mistake has resulted in an inequality." 27 Williston on Contracts § 70:24 (4th ed. & 2024 update).  For example, the Third District has affirmed the reformation of a life insurance policy even though the insured was still alive and no claim had been made on the policy.  *See Coastal States Life Ins. Co. v. Raphael*, 183 So. 2d 274, 275–77 (Fla. 3d DCA 1966).

**B**

Kaufman has suffered a cognizable Article III injury.  Assuming for purposes of the standing inquiry that the reformation claim will succeed on the merits, *see, e.g., Culverhouse v. Paulson & Co. Inc.*, 813 F.3d 991, 994 (11th Cir. 2016), Kaufman received a policy different than the one it bargained for, and paid a premium that was not commensurate with the coverage Liberty actually provided. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927 (11th Cir. 2020) (en banc) (explaining that conduct which "deprive[s] the plaintiffs of the benefit of their bargain . . . amount[s] to a direct economic loss that support[s] standing") (citing *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085–86 (11th Cir. 2019)); *In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices and Liability Litigation*, 903 F.3d 278, 283 (3d Cir. 2018) ("Under the benefit of the bargain theory, a plaintiff might successfully plead an economic injury by alleging that she bargained for a product worth a given value but received a product worth less than that value. The economic injury is calculated as the difference in value between what was bargained for and what was received.").

This injury, moreover, is both concrete and particularized. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016) (explaining that an injury is concrete if it actually exists and is particularized if it affects the plaintiff in a personal and individual way). And the fact that Kaufman is seeking an equitable remedy—reformation—rather than damages does not affect the nature of the injury. "The plaintiff is the master of [its] complaint and may choose the remedies [it] wishes to request." *Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 331 (6th Cir. 2018).[2]

There is also no ripeness problem. A "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and internal quotation marks omitted). A reformation claim, unlike a claim for declaratory relief, does not turn on any contingent future events because it is based on the contention that the parties (here the insured and the insurer) made a mutual mistake in the past in the execution of the policy. The claim, as noted, is that the policy issued is not the one the parties bargained for and agreed to.

---

[2] The remedy sought by a plaintiff may of course affect redressability, which is one of the elements of Article III standing. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (citation and internal quotation marks omitted). But redressability is not an issue here; if Kaufman prevails on its reformation claim it will get the policy that it bargained for and paid for.

Of note, Florida law subjects reformation claims to a five-year statute of limitations. *See* Fla. Stat. § 95.11(2)(b). And the Second District recently suggested that a reformation claim may accrue upon the execution of the contract, although it declined to definitively decide the matter. *See Hogg v. Vills. of Bloomingdale I Homeowners Ass'n*, 357 So. 3d 1271, 1275 n.4 (Fla. 2d DCA 2023). So an insured in Florida may need to bring a reformation claim soon after the issuance of the policy containing the mistake or risk forever losing the ability to fix the error.

### III

We next consider whether the policy issued by Liberty provides coverage for the approximately $3.3 million in water damage to the completed buildings. The answer to that question, which is one of law, *see State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1178 (11th Cir. 2023), turns on the meaning of the policy's COCE.

### A

Under Florida law, "[a]n insurance policy is to be construed in accordance with the plain language of the contract. Generally, insurance coverage must be broadly construed in favor of the insured, while exclusions must be narrowly construed against the insurer." *Air Quality Assessors of Fla. v. Southern-Owners Ins. Co.*, 354 So. 3d 569, 572 (Fla. 1st DCA 2022) (citing *Flores v. Allstate Ins. Co.*, 819 So. 2d 740, 744 (Fla. 2002)). Furthermore, "'[a]mbiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy,' and

'ambiguous insurance policy exclusions are construed against the drafter and in favor of the insured.'" *Id.* (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)).

As the district court put it, "it is helpful to begin by understanding what sort of policy is at issue." *Kaufman*, 658 F. Supp. 3d at 1248. A builder's risk policy "provide[s] protection for the building[s] under construction. Just as there are standard forms of property insurance used to insure existing buildings, builder's risk policies are used to insure the building[s] while [they are] in the process of being built." *Ajax Bldg. Corp. v. Hartford Fire Ins. Co.*, 358 F.3d 795, 799 (11th Cir. 2004) (discussing Florida law) (citations and internal quotation marks omitted). *See also Swire Pacific Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003) ("Builder's risk insurance is a type of property insurance coverage, not liability insurance or warranty coverage. The purpose of this type of insurance is to provide protection for fortuitous loss sustained during the construction of the building."). In contrast, a general commercial liability policy protects the insured from liability for damage or harm to others from its own defective work or products. *See LaMarche v. Shelby Mut. Ins. Co.*, 390 So. 2d 325, 326 (Fla. 1980) (explaining that the purpose of such a policy "is to provide protection for personal injury or for property damage caused by the completed product"). *Accord Wilshire Ins. Co. v. RJT Constr., LLC*, 581 F.3d 222, 226, 227 n.15 (5th Cir. 2009); *Farmington Cas. Co. v. Duggan*, 417 F.3d 1141, 1142 (10th Cir. 2005); *Modern Equip. Co. v. Continental Western Ins. Co.*, 355 F.3d 1125, 1129 (8th Cir. 2004).

The policy issued by Liberty to Kaufman is a general commercial liability policy and not a builder's risk policy. *See Kaufman*, 658 F. Supp. 3d at 1248. With that in mind, we turn to the language of the COCE in the policy.[3]

**B**

The COCE states in relevant part that "[t]his insurance does not apply to . . . [a]ny 'property damage' at or to any project insured under this policy during the course of construction *until the project is completed*." D.E. 96-1 at 45 (emphasis added). The term "project," though not separately defined, "includes, but is not limited to, buildings or structures and any supplies, materials or equipment used in connection with the project." *Id.* The policy does not define the term "completed."

The policy, as issued by Liberty, describes the "project" in question as:

> Project: Demolition of (5) five existing buildings and New, Ground-Up Construction of (2) two (4) four-story steel & concrete office buildings, (1) one (2) two-story dining hall, a 6k square foot, central energy plant, and a (6) six-story precast parking garage, as well as any operations within 1,000 feet of the designated project that are necessary and incidental thereto.

---

[3] Pursuant to its contract with Kaufman, JM Family was required to secure a builder's risk policy. *See* D.E. 148-9 at 189–90. As far as we can tell, there is no copy of that builder's risk policy in the record.

*Id.* at 62. If Kaufman is successful in its reformation claim, the "project" will be described in the policy as:

> Phase 1: 2 x 4-story steel and concrete office buildings (57k sq ft), a 2-story dining hall (27k sq ft), central energy plant (power, chillers, cooling tower, fire pump, emergency generator) (6k sq ft), 6-story precast parking garage (5 levels of parking, roof lid with solar panels) (306k sq ft)

> Phase 2: Demolish 5 existing buildings, 4-story steel and concrete office building (28k sq ft), 2-story training and conference center (35k sq ft), sports and recreation building (gym, basketball court, locker rooms, showers) (25k sq ft), amphitheater structure, hardscaping, landscaping, water features (fountains, reflecting pools)

D.E. 11-1 at 1 (Kaufman's insurance application).

We have not found any cases or authorities addressing the meaning or application of an exclusion like the COCE in a commercial general liability policy. And the parties have not cited any.

The critical language in the COCE is the phrase "until the project is completed," but the terms "project" and "completed" are not separately defined in the policy. Under Florida law, an undefined term in a policy has the meaning "ascribed to it in general usage" unless the document as a whole indicates that the parties agreed otherwise. *See Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 774 (Fla. 2023). *See also See Govt. Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017) ("When a term in an insurance policy

is undefined, it should be given its plain and ordinary meaning[.]")
(citation omitted).  The term "project" means a "planned or pro-
posed undertaking; a scheme."  2 Shorter Oxford English Diction-
ary 2362 (5th ed. 2002).  *See also* The American Heritage Dictionary
of the English Language 1402 (4th ed. 2009) ("A plan or proposal; a
scheme.").  And the term "completed" means to "[b]ring to an end,
finish, conclude."  1 Shorter Oxford English Dictionary at 468.  *See
also* American Heritage Dictionary of the English Language at 377
("To bring to a finish or an end.").

We agree with the district court, *see Kaufman*, 658 F. Supp.
3d at 1248–50, that the phrase "until the project is completed"
means that the COCE precludes coverage until the *entire* project is
finished.  Regardless of whether we view the term "project" as the
policy currently describes it or as the two distinct phases set out by
Kaufman in its application, the COCE's meaning is the same.  Even
if the first phase was finished at the time of the water damage, is
undisputed that the entire project had not yet been completed.  As
noted, some remaining buildings for the new campus were still un-
der construction and the old buildings had not been completely de-
molished.

It would have been better, of course, for Liberty to draft the
COCE to expressly state that there is no coverage unless and until
the "entire project" is completed.  But Liberty's failure to adhere to
the standards of impeccable draftsmanship here does not result in
ambiguity.  *See State Farm Mut. Auto Ins. Co. v. Pridgen*, 498 So. 2d
1245, 1248 (Fla. 1986) ("[T]he mere fact that a provision in an

insurance policy could be more clearly drafted does not necessarily mean that the provision is otherwise inconsistent, uncertain or ambiguous.").

Kaufman asserts that the COCE is ambiguous, but we disagree. In Florida, the insured's "application . . . becomes a part of the agreement between the parties and the policy together with the application form the contract of insurance." *Matthews v. Ranger Ins. Co.*, 281 So. 2d 345, 348 (Fla. 1973). As a result, Florida courts have sometimes looked to the insurance application to resolve a possible ambiguity in the policy. *See, e.g., Gen. Star Indem. Co. v. West Fla. Village Inn, Inc.*, 874 So. 2d 26, 30–31 (Fla. 2d DCA 2004). Here Kaufman's application—which sets out the two phases of the project—states that the "project start date" is May 1, 2018, and that the "project completion date" is June 1, 2021. *See* D.E. 11-1 at 1. So the project encompassed both phases and would be completed only when those phases were finished.

## C

Kaufman also urges us to look to the "products-completed operations hazard" subsection of the policy's "definitions" section to determine what "completed" means. That subsection reads, in relevant part, as follows:

> 16. "Products-completed operations hazard":
>
> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent arising out of "your product" or "your work" except: . . .

(2) Work that has not yet been completed or abandoned. However, *"your work" will be deemed completed at the earliest of the following time*s:

(a) When all the work called for in your contract has been completed.

(b) When all the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at the job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

D.E. 96-1 at 26–27 (emphasis added and indentations altered).

This subsection, though located in the "definitions" section of the policy, does not provide the relevant definition of "completed" for the COCE. It instead provides a definition for when "your work"—a term that is not used in the COCE—is completed. Kaufman would have us treat the terms "your work" and "project" synonymously, but this is not how the policy reads. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979) (explaining that the rule requiring ambiguities to be interpreted against the drafter "does not allow courts to rewrite contracts [or] add meaning that is not present"). And, as its title suggests, the subsection provides a definition that applies specifically to the portions of the policy dealing with the products-completed operations hazard. As Liberty points out, it would make little sense to import this definition into the COCE, as that would mean that

Kaufman would receive coverage for each subcontractor's work on a building as soon as that work was complete, even while the building as a whole was still under construction—and the COCE specifically excludes coverage for damages that occur "during the course of construction."

Appearing as amici, a number of contractors' and builders' associations express concern that Liberty drafted a more onerous COCE through a "sleight of hand," and warn that such a practice could harm construction businesses by rendering coverage unreliable. *See* Br. for Associated General Contractors of America et al. as Amici Curiae at 6 (asserting that the COCE "replaced [a] deleted property damages exclusion with a more onerous exclusion denying coverage for any property damage occurring during construction operations"). But the policy Kaufman obtained from Liberty was through a contractor-controlled insurance program that is used by a general contractor "to provide all participants in the insured construction project—the general contractor, the owner, and all subcontractors—with dependable and affordable insurance coverage under a single commercial liability . . . insurance policy." *Id.* at 4.

As we have noted, JM Family was required to obtain builder's risk insurance pursuant to its contract with Kaufman. The builder's risk policy, however, is not in the record. We therefore do not know whether the COCE drafted by Liberty created a problematic gap in coverage.

**IV**

The final question is whether the district court properly denied Liberty's motion for attorney's fees under Florida's offer of judgment statute. Our review is plenary. *See McMahan v. Toto*, 311 F.3d 1077, 1081 (11th Cir. 2002).

Pursuant to Fla. Stat. § 768.79 and Fla. R. Civ. P. 1.442, Liberty served Kaufman with a $100 settlement proposal to resolve Kaufman's counterclaims for declaratory relief and breach of contract. Liberty did not offer to settle Kaufman's counterclaim for reformation. Nor did it offer to settle its own claim for declaratory relief. Kaufman rejected Liberty's proposal.

After the district court ruled in its favor on the coverage issue based on the language of the COCE, Liberty moved for attorney's fees pursuant to § 768.79. The district court denied the request, ruling that Liberty had failed to include in the settlement proposal its own claim for declaratory relief. *See* D.E. 217 at 3–4. We conclude, for the reasons set out below, that the district court correctly denied Liberty's motion for attorney's fees.

As relevant here, § 768.79(1) reads as follows:

In any civil action for damages . . . , if a defendant files an offer of judgment which is not accepted by the plaintiff within 30 days, the defendant shall be entitled to recover reasonable costs and attorney's fees incurred by her or him or on the defendant's behalf pursuant to a policy of liability insurance or other contract from the date of filing of the offer if the judgment is one of no liability or the judgment obtained

> by the plaintiff is at least 25 percent less than such offer[.]

Rule 1.442(c)(2)(B), which applies to "offers made pursuant to § 768.79," *McMahan*, 311 F.3d at 1082, provides (emphasis ours) that the proposal of settlement must state that it "resolves *all* damages that would otherwise be awarded in a final judgment in the action in which the proposal is served[.]" The committee note to the 2013 amendment to Rule 1.442 states that subsection (c)(2)(B) was "amended to clarify that a proposal for settlement must resolve *all* claims between the proponent and the party to whom the proposal is made[.]" Fla. R. Civ. Proc. 1.442, Committee Note to 2013 Amendment (emphasis added).

Both § 768.79 and Rule 1.442 are "strictly construed because they are in derogation of the common law rule that each party is responsible for its own attorney's fees." *Starboard Cruise Servs., Inc. v. DePrince*, 259 So. 3d 295, 298 (Fla. 3d DCA 2018). The Florida Supreme Court has held that "that [§] 768.69 does not apply to an action in which a plaintiff seeks both damages and equitable relief, and in which the defendant has served a general offer of judgment that seeks release of all claims." *Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 374 (Fla. 2013). *See also id.* at 375 ("The statute does not state that it applies to actions in equity, or in an action, such as in this case, where a plaintiff seeks both monetary and nonmonetary relief. If the Legislature intended to authorize the recovery of attorney's fees under those circumstances, it could have and would have explicitly provided for them in [§] 768.79.").

Generally speaking, "while a party can serve an offer or demand for judgment directed to a claim for monetary damages, it cannot avail itself of [§ 768.69] where a claim is seeking non-monetary relief only." *Winter Park Imports, Inc. v. JM Family Enters.*, 66 So. 3d 336, 340 (Fla. 5th DCA 2011). As a result, a claim for declaratory relief which seeks only an adjudication as to insurance coverage does not come within the ambit of § 768.79(1). *See Nat'l Indem. Co. of the S. v. Consol. Ins. Servs.*, 778 So. 2d 404, 408 (Fla. 4th DCA 2001) ("[T]he 'real issue' in this case is insurance coverage for an underlying tort action. No money damages or payment of money is directly requested in this suit[.]"). But if the real issue in a claim for declaratory relief is who is entitled to money, then § 768.79 applies. *See Nelson v. Marine Grp. of Palm Beach, Inc.*, 677 So. 2d 998, 999 (Fla. 4th DCA 1996) ("Although buyer brought this action as a declaratory judgment, the only matter at issue was money— whether seller was entitled to retain the escrowed deposit as liquidated damages or whether buyer was entitled to its return. As evidenced both by the real issues in dispute and the counterclaim which clearly framed this case as an action for damages, the offer of judgment statute properly applied.").

Here Kaufman asserted a counterclaim for declaratory relief as well as a counterclaim for breach of contract. Liberty argued in the district court that it could seek attorney's fees under § 768.79(1) because Kaufman's counterclaim for declaratory relief as to coverage was essentially a claim for monetary damages that was subsumed in the counterclaim for breach of contract. We have some doubts about that assertion, but assuming that it is legally correct

then Liberty's own claim for declaratory relief as to coverage—which was the mirror image of Kaufman's claim for declaratory relief as to coverage—was also essentially a claim involving monetary damages. After all, Kaufman requested more than $3 million on its counterclaims, *see* D.E. 217 at 2, and Liberty sought to prevail on those counterclaims through its own claim for declaratory relief. By not including its own claim for declaratory relief in the proposal, Liberty failed to comply with the requirements of § 768.79 and Rule 1.442(c)(2)(B).

Liberty contends that its own claim for declaratory relief only sought a judicial determination as to coverage, but if that is so then the same would also be true for Kaufman's claim for declaratory relief. As the district court put it, "Liberty cannot have it both ways: its claim for declaratory relief on the same issues is 'purely equitable,' but Kaufman's is really about monetary damages. It is either [that] both are claims for damages or not. In either permutation, Liberty's [settlement proposal] is invalid[.]" D.E. 217 at 4.

Liberty relies on *Southern Specialties, Inc. v. Farmhouse Tomatoes, Inc.*, 259 So. 3d 869 (Fla. 4th DCA 2018), but it places too much weight on that decision. In that case the Fourth District reversed an award of attorney's fees under § 768.79 because the settlement proposal included claims for both monetary and equitable relief. *See id.* at 871–72. Although the Fourth District noted that the defendant had not "attempt[ed] to carve out the injunctive relief claim" in its proposal, *see id.* at 872, that language does nothing to solve the problem noted above—the failure of Liberty's settlement

proposal to resolve *all* claims for monetary relief as required by Rule 1.442(c)(2)(B).

## V

Kaufman has Article III standing to seek reformation of the policy. We therefore reverse the district court's dismissal of the reformation counterclaim and remand for further proceedings.

With respect to the parties' dispute about the policy, we affirm the district court's ruling that the COCE precludes coverage for the water damage to the buildings caused by Tropical Storm Eta.

Finally, we affirm the district court's denial of Liberty's motion for attorney's fees.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.**