**16-3526**
*DuBuisson v. Stonebridge Life Ins. Co.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term 2017

(Argued: November 14, 2017    Decided: April 12, 2018)

Docket 16-3526

MANETTE DUBUISSON, Individually and on behalf of all others similarly
situated, ALICE LACKS, Individually and on behalf of all others similarly
situated, and GEORGE GONZALES, Individually and on behalf of all others
similarly situated,

*Plaintiffs-Appellants*,

v.

STONEBRIDGE LIFE INSURANCE COMPANY, FKA J.C. PENNEY LIFE
INSURANCE COMPANY, TRANSAMERICA FINANCIAL LIFE INSURANCE
COMPANY, FEDERAL INSURANCE COMPANY, A MEMBER OF THE CHUBB
GROUP OF INSURANCE COMPANIES,

*Defendants-Appellees.*[*]

———————

Before:
        POOLER, WESLEY, and HALL, *Circuit Judges*.

Plaintiffs Manette DuBuisson, Alice Lacks, and George Gonzales, on behalf
of themselves and others similarly situated, appeal from a March 25, 2015 order

---

[*] The Clerk of the Court is respectfully directed to amend the official caption as noted
above.

from the United States District Court for the Southern District of New York (Gardephe, *J.*) dismissing their putative class action for lack of standing. Their complaint alleges that defendants, a group of insurance providers, banks, and credit card companies, targeted credit card holders with fraudulent solicitations for illegal accidental disability and medical expense insurance policies. Plaintiffs were among the card holders who purchased those insurance policies, which plaintiffs allege were void *ab initio* because they violated applicable New York insurance law. Although plaintiffs did not suffer qualifying losses or make claims for coverage, they argue that they are nevertheless entitled to reimbursement of the premiums and fees they paid defendants, as well as enhanced damages, based on quasi-contract, civil fraud, and statutory claims.

The District Court granted defendants' motion to dismiss, reasoning that plaintiffs could not establish the injury-in-fact element of Article III standing. Specifically, the court concluded the policies were not void *ab initio* because under a New York savings statute, plaintiffs would have received coverage had they filed claims for qualifying losses. *See* N.Y. Ins. Law § 3103. Additionally, the court concluded that if the policies were not void *ab initio*, plaintiffs could not satisfy the injury-in-fact requirement because they never submitted claims under the policies. Because the court found that it lacked jurisdiction, it declined to resolve defendants' remaining arguments for dismissal pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

This analysis was flawed. As we have explained, an Article III court must resolve the threshold jurisdictional standing inquiry before it addresses the merits of a claim. *See Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 464 (2d Cir. 2013). The District Court's analysis conflated the requirement for an injury in fact with the underlying validity of plaintiffs' arguments, and in so doing, the court engaged a question of New York state law that the state courts have yet to answer. We hold that plaintiffs have standing and therefore **VACATE** the decision below and **REMAND** for the District Court to address defendants' remaining ground for dismissal.

———————————

ROGER L. MANDEL, Lackey Hershman, L.L.P, Dallas, TX, *for Plaintiffs-Appellants*.

H. CHRISTOPHER BOEHNING (Shane Avidan, Jessica S. Carey, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendant-Appellee Federal Insurance Company.*

STEPHEN R. CLARK, Winstead PC, Dallas, TX (J. David Brown, Winstead PC, Dallas, TX; Steven B. Getzoff, Lester Schwab Katz & Dwyer, LLP, New York, NY, *on the brief*), *for Defendant-Appellee Stonebridge Life Insurance Company, FKA J.C. Penney Life Insurance Company.*

———————————

WESLEY, *Circuit Judge*:

Group insurance policies, unlike individual insurance policies, are contracts for the benefit of third parties. Under a group insurance program, a central entity—the group—enters into a contract with an insurance provider and acts as the policyholder. Members of the group are the third-party beneficiaries of that contract. Typically, state law defines what entities may issue group insurance policies, and group members are almost always employees of a company or members of an organization formed for purposes other than obtaining insurance coverage. *See, e.g.,* N.Y. Ins. Law §§ 4235, 4237 (listing organizations that may issue group and blanket health or accident plans in New York). Group members each receive the same one-size-fits-all insurance policy, sometimes without ever seeing the master policy that contains the terms of their coverage. *See* Steven Plitt, Daniel Maldonado & Joshua D. Rogers, Couch on Insurance § 7:1 (3d ed. 2017).

3

Group insurance is desirable to insurers because the larger pool of insureds reduces the insurer's risk and eliminates administrative costs. In theory, group members also benefit from enrollment in group policies for two primary reasons. First, insurers pass on the lower cost of insurance to insureds in the form of reduced premiums. Second, insureds do not need to negotiate with insurers or shop around for the best insurance policy because the group, as the policyholder, presumptively serves that role. *See id*.

In addition to limiting what entities may issue group policies, New York requires an eligible group to obtain approval from a regulatory agency before offering group insurance. *See* N.Y. Ins. Law § 3201(b)(1). New York also has a savings provision that requires insurers to honor claims on illegal policies to prevent lapses in coverage for individual and group policies. *See* N.Y. Ins. Law § 3103(a) (invalid or illegal insurance policies "shall be valid and binding upon the insurer"). At issue in this suit is the validity of a group policy that defendants, a collection of insurance providers and marketing companies, advertised and sold to plaintiffs, allegedly in violation of New York Insurance Laws.

4

## BACKGROUND

### I.     The HealthExtras Program

In 1997, HealthExtras, Inc., created a group insurance program that offered $1,000,000 or $1,500,000 accidental permanent and total disability coverage, plus $2500 emergency accident and sickness medical expense coverage ("HealthExtras Program"). HealthExtras advertised and sold policies to consumers through marketing agreements with banks and companies that issued credit cards, including American Express, Citibank, Capital One, J.C. Penney, Sears, and Conoco Phillips. The banks and credit card companies solicited cardholders to enroll in the HealthExtras Program by sending flyers with their customers' monthly credit card bills, by direct mail, or by telephone. The flyers included images of the late actor Christopher Reeve, statements by Mr. Reeve endorsing the HealthExtras Program, and brief descriptions of the HealthExtras policies.[1]

If a cardholder expressed interest in the HealthExtras Program, the marketing agent mailed them a program description encouraging them to enroll

---

[1] For example, one of the solicitations read:

> Financial Security. You're covered with $1.5 Million if an accident leaves you permanently disabled. . . . The American Express Accidental Disability Plan provides you with $1.5 million in one lump sum if you are permanently disabled as the result of an

and reminding them that HealthExtras "was created to provide families with financial security" because sometimes "lives change in an instant, like Christopher Reeve's." Joint App. A-38. Cardholders who chose to enroll did so by agreeing to a monthly charge on their credit card bill. Because HealthExtras is not a licensed insurer or broker, however, it contracted with defendants Stonebridge, TransAmerica, and Federal to underwrite and issue the disability insurance.[2]

Defendants issued the policies to HealthExtras, the policyholder, as group and blanket accident disability and medical expense insurance, and the enrolled

---

accident and can't return to work. For only $9.95 a month, you can help guarantee your financial security now and in the future . . . . With the American Express Accidental Disability Plan you can prevent a personal tragedy from becoming a financial tragedy. Enroll now, and for only $9.95 a month, you can rest assured that you are protected.

Joint App. A-161.

[2] On January 25, 2018, this Court received notice from plaintiffs' counsel indicating that they had reached a settlement agreement with defendant-appellant Federal and that the parties "intend to seek the dismissal of this appeal as to Federal pursuant to Federal Rule of Appellate Procedure 42(b)." Dkt. No. 155. However, this Court has not received a dismissal agreement as required by F.R.A.P. 42(b) and until such an agreement is docketed and a dismissal order entered, Federal will remain a party to the appeal. Additionally, HealthExtras contracted with National Union and Virginia Surety to underwrite disability and medical expenses insurance, respectively, but those entities entered into a global settlement with plaintiffs and are not parties to this appeal. Plaintiffs have also either settled with or withdrawn their claims against HealthExtras (now known as Catamaran Health Solutions, LLC), Virginia Surety Company, and American International GroupAIG.

card holders became group members. The policies, however, narrowly circumscribed the kinds of injury or illness under which policy holders could recover.[3] Plaintiffs were among the card holders who purchased HealthExtras coverage. They began paying premiums on the policies in 2000 and continued to do so until HealthExtras terminated the HealthExtras Program in December 2014. During their fourteen years of coverage, plaintiffs did not suffer qualifying losses or submit claims.

## II. The Complaint and Motion to Dismiss

Plaintiffs commenced the present class action in the United States District Court for the Southern District of New York (Gardephe, *J.*) in March 2015. Although the members of plaintiffs' putative class did not suffer qualifying losses or make claims for coverage under their policies, plaintiffs argue that they are entitled to reimbursement of the premiums and fees they paid defendants, as well as enhanced damages. Their complaint alleges quasi-contract claims based on

---

[3] For example, the disability policies defined "Loss" as "total and permanent Loss of Use" of "both hands or both feet" or "one hand and one foot," "total and permanent Loss of sight in both eyes," "total and permanent Loss of speech," or "total and permanent Loss of hearing in both ears." Joint App. A-64. "Loss of Use," in turn, was restricted to "actual severance through or above a wrist or ankle or total paralysis of a limb or limbs which is determined by a competent medical authority to be permanent, complete and irreversible." *Id.*

violations of New York Insurance Law, claims based on violations of New York consumer protection laws, and common-law fraud claims.

*First*, plaintiffs allege that defendants sold them insurance coverage that was void *ab initio* because the policies (1) "were not issued to eligible entities" as that term is defined in New York Insurance Law §§ 4235 and 4237; (2) "were not filed with and approved by the Superintendent of New York's Department of Insurance, violating N.Y. Ins. Law § 3201(b)(1)"; and (3) did not contain certain provisions required by § 3221 of New York Insurance Law. Joint App. A-83. These deficiencies, according to plaintiffs, rendered the policies illegal, meaning "no risk ever attached to [their] coverage" and defendants were thereby enriched at plaintiffs' expense through "receipt of the premiums or fees." *Id.*

Alternatively, plaintiffs allege that even if their coverage was not void *ab initio*, it was voidable for illegality. Plaintiffs argue New York Insurance Law is intended to protect them from illegal insurance contracts and that defendants were enriched at their expense when they failed to comply with the law. For their quasi-contract claims, plaintiffs seek reimbursement of fees and premiums they paid to defendants.

*Second*, plaintiffs allege violations of New York General Business Law §§ 349 and 350, which prohibit unfair or deceptive trade practices and false advertising, respectively. Specifically, the complaint alleges that defendants sent marketing materials discussing the "nature and benefits of the HealthExtras Program" and written certificates of insurance that "falsely[] represented that the Policies . . . were legal under New York law" and "provided real and valuable insurance coverage." Joint App. A-87, A-92. Plaintiffs also allege that defendants failed to disclose certain material facts and thereby misrepresented the nature of the insurance coverage they sold to plaintiffs.[4] These deceptive acts and false advertising, according to plaintiffs, caused them to pay premiums or fees for illegal or valueless policies. For their statutory claims, plaintiffs seek reimbursement of fees and premiums they paid to defendants—actual damages— plus attorneys' fees and statutory damages up to three times the actual damages.

*Third*, plaintiffs allege that defendants committed common-law fraud, fraud in the inducement, or aiding and abetting fraud. The complaint alleges that

---

[4] For example, plaintiffs claim that defendants failed to disclose that they participated in a program in which unsuspecting credit card holders and others were targeted for what appeared to be beneficial low-cost group insurance policies, but what were in fact illegal and valueless policies. Joint App. A-88, A-89. Ultimately, therefore, plaintiffs' statutory claims are also dependent on a determination that the underlying policies were in fact in violation of New York law.

defendants knew statements in their marketing materials were false because defendants in general are charged with knowing the terms of New York Insurance Law and these defendants knew that the subject policies did not comply. *See Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827–30 (2016) (describing elements of fraud). Thus, plaintiffs argue, defendants knowingly made false statements to induce them to purchase HealthExtras coverage and plaintiffs, justifiably relying on those false statements, purchased illegal coverage that no reasonable person would have purchased in the absence of fraud.

Defendants filed a joint motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6). They argued the District Court lacked subject-matter jurisdiction over plaintiffs' action because plaintiffs could not demonstrate an injury in fact as required for Article III standing. Specifically, defendants' position is that New York's savings statute, N.Y. Ins. Law § 3103,[5]

---

[5] The savings statute provides:

> [A]ny policy of insurance or contract of annuity delivered or issued for delivery in this state in violation of any of the provisions of this [New York Insurance Law] chapter shall be valid and binding upon the insurer issuing the same, but in all respects in which its provisions are in violation of the requirements or prohibitions of this chapter it shall be enforceable as if it conformed with such requirements or prohibitions.

renders otherwise illegal policies valid and enforceable against an insurer and that plaintiffs therefore received the insurance for which they paid.

The District Court granted defendants' motion to dismiss for lack of standing; it did not reach any other grounds for dismissal.[6] *See Gonzales v. Nat'l Union Fire Ins. Co.*, 15-2259, 2016 WL 5107033 (S.D.N.Y. Sept. 19, 2016). The court noted that each of plaintiffs' claims is premised on their allegation that the policies were illegal,[7] but under New York Insurance Law, New York courts "enforce [the

. . .

> In any action to recover under the provisions of any policy of insurance or contract of annuity delivered or issued for delivery in this state which the superintendent is authorized by this chapter to approve if in his opinion its provisions are more favorable to policyholders, the court shall enforce such policy or contract as if its provisions were the same as those specified in this chapter unless the court finds that its actual provisions were more favorable to policyholders at the date when the policy or contract was issued.

N.Y. Ins. Law § 3103(a), (c).

[6] In their motion to dismiss, defendants also argued that plaintiffs did not plead fraud with sufficient particularity under Federal Rule of Civil Procedure Rule 9(b), that they failed to state a claim upon which relief could be granted under Federal Rule of Civil Procedure Rule 12(b)(6), and that all of their claims are time-barred.

[7] Reading the complaint in the light most favorable to plaintiffs, *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 79 (2d Cir. 2017), their allegations are essentially that: (1) defendants were unjustly enriched when plaintiffs paid them premiums for illegal policies; (2) defendants knew the policies were illegal but marketed them as if they complied with New York law and in so doing received premium payments from plaintiffs; and (3) defendants defrauded plaintiffs by inducing them to purchase illegal policies.

policy] as if it did include the [required] provision." *Id.* at *7 (citing *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 624 n.1 (2d Cir. 1996)). Section 3103, the court concluded, "plain[ly] and unambiguous[ly]" makes illegal policies valid and binding upon the insured, and plaintiffs were therefore not entitled to recover any premiums or fees. *Id.* at *8. Plaintiffs could have sought to enforce the policies if and when a qualifying injury had occurred, but because they did not suffer a qualifying injury or seek to enforce the policies, they could not establish that they had suffered an injury in fact. *Id.* The court also held that the mere fact of a statutory violation did not confer standing and that plaintiffs' claims for misrepresentations and omissions, even if true, were too speculative to establish standing because plaintiffs never submitted claims.[8] This appeal followed.

---

[8] The court treated plaintiffs' claims for deceptive acts and false advertising as alleging plaintiffs were harmed because they would have had to sue before defendants would cover a qualifying injury. These allegations, the court concluded, were conclusory and conjectural because plaintiffs never suffered qualifying injuries or filed claims that defendants might have rejected. *Gonzales*, 15-2259, 2016 WL 5107033, at *9. However, the court's interpretation did not "constru[e] the complaint in plaintiff[s'] favor" as required by Federal Rule of Civil Procedure 12(b)(1). *See Crupar-Weinmann*, 861 F.3d at 79 (internal quotation marks omitted). Reading the complaint in plaintiffs' favor, their claims for deceptive acts and false advertising are that they were harmed because they "received insurance coverage that was not as represented to them"; thus, even if the policies were ultimately enforceable, plaintiffs allege they were injured when defendants induced them to overpay for the insurance they received. Joint App. A-90.

## DISCUSSION

We review *de novo* the District Court's decision to dismiss plaintiffs' complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1), "construing the complaint in plaintiff[s'] favor and accepting as true all material factual allegations contained therein." *Crupar-Weinmann*, 861 F.3d at 79 (internal quotation marks omitted). "Where, as here, a case is at the pleading stage, the plaintiff[s] must clearly allege facts demonstrating each element [of standing]." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks and alterations omitted).

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Id.* (internal citation omitted). It is axiomatic that "the irreducible constitutional minimum of standing contains three elements": the plaintiff must have suffered an injury in fact (1) that is concrete and particularized, (2) that is causally linked to the defendant's challenged conduct, and (3) that is likely to be redressed by a

13

favorable decision. *Crupar-Weinmann*, 861 F.3d at 79 (internal quotation marks omitted). Only one of those elements—injury in fact—is at issue here.

The injury-in-fact requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). That requirement, in turn, "is functionally tied to the separation of powers and judicial competence concerns underlying the standing doctrine." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408–09 (2013) (noting that the injury-in-fact requirement serves in part "to prevent the judicial process from being used to usurp the powers of the political branches"). Of course, it is tempting, from the perspective of judicial efficiency, to treat a meritless claim—one in which a plaintiff's theory of liability comes up short—as a claim in which the plaintiff has not been injured in the first instance. But where the legislature has created a framework that offers injured plaintiffs an opportunity to seek redress, "we must avoid conflating the requirement for an injury in fact with the validity of [a plaintiff's] claim" to constrain the scope of judicial authority and ensure that legislative decisions are

14

left to the legislature. *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 464 (2d Cir. 2013) (internal quotation marks and alterations omitted).

To establish injury in fact, a plaintiff need only show that he or she suffered an invasion of a legally protected interest that is concrete and particularized. *Spokeo*, 136 S. Ct. at 1548. "For an injury to be particularized, it must affect the plaintiff in a personal and individual way," and an injury is concrete if it is "real[] and not abstract," although an injury need not be tangible to be concrete. *Id.* at 1548 (internal quotation marks omitted). What matters is that a plaintiff must clearly allege facts sufficient to constitute an injury in fact, but those allegations "need not be capable of sustaining a valid cause of action." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).

Plaintiffs have standing. First, with respect to their quasi-contract claims, they argue they paid premiums for disability and medical expense insurance policies that are illegal under New York law and are therefore void *ab initio* or, in the alternative, voidable. Accepting plaintiffs' allegations as true and assuming they would be successful on the merits—as we must for purposes of our threshold jurisdictional analysis, *Crupar-Weinmann*, 861 F.3d at 79—they have articulated a concrete, economic injury: payment of premiums on a void or voidable insurance

15

policy.[9] That is all plaintiffs need allege to establish an injury in fact for the purposes of Article III standing. *Spokeo*, 136 S. Ct. at 1547–48.

According to defendants, plaintiffs lack standing to assert their quasi-contract claims because application of the savings statute would provide, in essence, an affirmative defense by requiring the insurers to honor the allegedly illegal policies had plaintiffs filed claims; in other words, plaintiffs were not injured because their claims are meritless. That argument, however, asks us to do what we cannot: decide the merits of the claim en route to determining its justiciability. *See Mashantucket Pequot Tribe*, 722 F.3d at 464. Where a plaintiff alleges a concrete, economic injury resulting from a defendant's violation of a statutory provision, the plaintiff has alleged a sufficient injury to establish Article III standing, regardless of the merits of the plaintiff's statutory interpretation. *See Carver v. City of New York*, 621 F.3d 221, 226 (2d Cir. 2010).[10]

---

[9] Because the District Court dismissed the case before extensive discovery, the full amount of the class-wide award plaintiffs are pursuing is not clear. However, counsel for plaintiffs estimated at oral argument that in New York State, members of the putative class had paid between $10,000,000 and $20,000,000 in premiums on their HealthExtras policies. *See* Oral Argument at 20:14, *Gonzales v. Nat'l Union Fire Ins. Co.*, 16-3526 (2d Cir. Nov. 14, 2017), http://www.ca2.uscourts.gov/decisions/isysquery/75bf6584-4fbc-4c8b-9668-29d46d963694/91-100/list/.

[10] For example, in *Carver*, a recipient of public benefits won $10,000 in the New York State lottery. *Id.* at 224. A state statute directed the Commissioner of Social Services to recover a portion of lottery winnings from public welfare recipients; therefore, the Commissioner

Plaintiffs have met that burden by alleging harm in the form of premium payments on illegal policies, and they have standing to pursue their quasi-contract claims irrespective of the fact that defendants propose a reading of a statute that would, if accepted, undermine the merits of plaintiffs' claims. *See id.*; *see also Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal." (internal quotation marks omitted)).

Second, plaintiffs have standing to pursue their statutory and common-law fraud claims. Both categories of claims allege that defendants misrepresented the nature of the HealthExtras policies by failing to disclose that they were not issued in compliance with New York law and in so doing, induced plaintiffs to purchase the policies at an inflated price.[11] Plaintiffs have articulated an injury in fact: the

---

intercepted $5000 of Carver's lottery winnings. *Id.* Carver sued the City, alleging that it violated labor law "by paying him minimum wage while requiring that he return some portion of those wages in the event he won the lottery." *Id.* at 226. On appeal, we held that Carver had standing, notwithstanding the fact that based on his reading of the statute, "the City seemingly could not have complied with its minimum-wage obligations." *Id.* As we explained, the propriety of Carver's statutory interpretation—however implausible—was "a merits issue." *Id.*

[11] Specifically, the pleadings allege that defendants knew or should have known that the HealthExtras policies (1) were not issued to eligible entities under New York Insurance Law §§ 4235 and 4237, (2) were never approved by the Superintendent of New York's Department of Insurance, in violation of New York Insurance Law § 3201(b)(1), and (3) lacked provisions required by New York Insurance Law § 3221(a). Joint App. A-83.

difference in price between what they would have paid for the policies with full information and what they in fact paid. *See Crupar-Weinmann*, 861 F.3d at 79. Therefore, even if the HealthExtras policies would have been enforced under New York law, plaintiffs are entitled to pursue their claims for at least some portion of the premiums they paid; whether the contracts for those policies were procured by fraud or whether defendants fraudulently or deceptively misrepresented the nature of the coverage they offered or the ability of plaintiffs to submit claims for loss under it are questions that go to the merits.

The District Court's resolution of this case is problematic for an additional reason. The New York statute upon which the defendant-insurers rely, § 3103(a), has never been interpreted by a New York state court or the New York Court of Appeals as precluding an insured from bringing a claim against an insurer for a refund of premiums paid for an illegal policy.[12]

---

Defendants did not disclose these alleged deficiencies in their marketing materials, and plaintiffs therefore argue that they purchased illegal coverage that no reasonable person with full knowledge of the nature of the coverage would have selected. *See id.* at A-100, A-87, A-88, A-93.

[12] We mean no criticism of a very able District Court judge. He does not have the power to ask a New York court its views on the statute or its application to claims like plaintiffs'. *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a) (2018) (listing courts from which the New York Court of Appeals will accept certified questions). We note only that a merits analysis of the statute's reach is troubling from both a standing and merits perspective.

Without commenting on the merits of plaintiffs' arguments, we note that the statute appears to have been enacted with the purpose of protecting insureds, not insurance companies. *See, e.g., Bersani v. Gen. Acc. Fire & Life Assur. Corp.,* 36 N.Y.2d 457, 460 (1975) (reasoning that an insurance policy that violated New York Insurance Law was illegal and "against public policy" and, citing § 3103's predecessor, holding that such a policy was "valid and binding on [the insurer]"); *see also* Bill Jacket L. 1939 ch. 882 (in discussion of the recodification of the Insurance Law in 1939, repeatedly emphasizing the need for insurance regulation to benefit and protect the public); *Insurance Law Revision of the State of New York* § 60.55 cmt. at 138 (describing the predecessor statute to § 3103 as "giv[ing] the insured the option to enforce the contract as written if he finds it more favorable than the required provisions"). To read the savings clause in such a way as to prevent insureds from being heard in court when they discover that the policies they have been sold are illegal thus conflicts with the apparent legislative intent behind the savings clause.[13] By conflating the merits questions with the standing

---

[13] The statute is written in terms of "enforcing" the illegal terms of a policy. *See, e.g.,* N.Y. Ins. Law § 3103(a) (noting that an unlawful policy "shall be enforceable as if it conformed with such requirements or prohibitions" of the Act). It would seem that should an insured seek to enforce a provision for which the insurer raises a defense based on its own illegal conduct, the savings clause would step in and prevent the insurer from benefiting from

inquiry, the District Court may have failed to give due consideration to this novel question of state law and reached an outcome that would preclude putative plaintiffs from seeking redress in state or federal court.

The Eighth Circuit reached a similar conclusion in another case involving HealthExtras and a class of plaintiffs that had not suffered qualifying losses or made claims for coverage under the policies. *See Graham v. Catamaran Health Sols. LLC*, 16-1161, 2017 WL 3613328 (8th Cir. Aug. 23, 2017). In *Graham*, the defendants relied on an Arkansas savings statute analogous to § 3103(a) under which insurance policies that do not comply with Arkansas law "shall be construed and applied according to the conditions and provisions that would have applied had the policy, rider, or endorsement been in full compliance with state law." *See* Ark. Code Ann. § 23-79-118. As in this case, the *Graham* defendants argued that in light of the savings statute, "the proposed class members paid for and received enforceable insurance, and the absence of claims meant allegations of invalidity were mere abstractions rather than concrete and particularized injuries." *Graham*, 16-1161, 2017 WL 3613328 at *2.

---

its misdeed. But an insured who seeks to undo an illegal contract is not seeking enforcement of the illegal promises made by the insurer; she is seeking rescission.

20

On appeal, the Eighth Circuit rejected that argument and held that the named plaintiff had standing to pursue two classes of claims. First, as to the theory that the HealthExtras policies were void *ab initio*, the court noted that the defendants' argument depended on the merits of the underlying claim. *Id.* at *4. Ignoring the defendants' statutory argument and looking instead to the plaintiff's allegations, the court concluded that "if the policy is deemed void *ab initio* due to non-compliance with state law," the plaintiff would have suffered an injury in fact. *Id.* Second, as to allegations of injury even if the policies were not void, the Eighth Circuit held that the plaintiff had standing because his claims sought "a refund of all or at least some portion of premiums paid." *Id.*

We agree with the Eighth Circuit's reasoning. "Standing analysis does not permit consideration of the actual merits of a plaintiff's claim." *Id.* Whether the policies were void *ab initio*, whether the savings statute rendered them valid, and whether plaintiffs overpaid for the policies are questions that "go[] to the merits, not the threshold standing analysis." *Id.* Plaintiffs have alleged concrete and particularized harms for all of their claims, and for the purposes of Article III, they have therefore alleged sufficient facts to establish the elements of standing.

## CONCLUSION

The District Court erred when it dismissed plaintiffs' claims for lack of standing. For the foregoing reasons, the opinion and order of the District Court granting defendants' motion to dismiss for lack of standing is **VACATED** and the case is **REMANDED** for further proceedings.