*Clementine Co. v. Adams*

# United States Court of Appeals
# For the Second Circuit

---

August Term 2022

Argued: May 17, 2023
Decided: July 20, 2023

No. 22-2599

---

THE CLEMENTINE COMPANY, LLC, DBA THE THEATER CENTER, WEST END ARTISTS
COMPANY, DBA THE ACTORS TEMPLE,

*Plaintiffs-Appellants*,

PLAYERS THEATER MANAGEMENT CORP., DBA THE PLAYERS THEATER, SOHO
PLAYHOUSE, INC., DBA SOHO PLAYHOUSE, CARAL LTD., DBA BROADWAY COMEDY
CLUB,

*Plaintiffs*,

*v.*

ERIC ADAMS, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF NEW YORK,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Southern District of New York
No. 21-cv-7779, Colleen McMahon, *Judge*.

---

Before:  CALABRESI, LOHIER, and NATHAN, *Circuit Judge*s.

Plaintiffs-Appellants, who operate small venue theaters in New York City, brought claims for declaratory and injunctive relief and nominal damages, alleging that the City's Key to NYC program—which required certain indoor venues to check the COVID-19 vaccination status of patrons and staff before permitting entry—violated their rights to free speech and equal protection under the First and Fourteenth Amendments.  Following the expiration of the Key to NYC program, the district court dismissed as moot Plaintiffs' claims for declaratory and injunctive relief.  The district court also dismissed Plaintiffs' claim for nominal damages for lack of standing, concluding that Plaintiffs failed to plausibly allege an injury in fact.  Plaintiffs now appeal from that order.  Although we conclude that Plaintiffs have plausibly alleged Article III standing, we affirm the judgment of dismissal on the alternative ground of failure to state a claim.

AFFIRMED.

> MATTHEW KEZHAYA, Crown Law, Minneapolis, MN, *for Plaintiffs-Appellants*.
>
> ELINA DRUKER (Richard Dearing, Claude S. Patton, *on the brief*), *for* Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, New York, NY, *for Defendant-Appellee*.

NATHAN, *Circuit Judge*:

Plaintiffs-Appellants The Clementine Company LLC d/b/a The Theater Center and West End Artists Company d/b/a The Actors Temple appeal from an order of the United States District Court for the Southern District of New York (McMahon, *J.*) dismissing their claims against Eric Adams, the Mayor of the City of New York, for lack of subject-matter jurisdiction because Plaintiffs failed to

2

allege an injury in fact sufficient to confer Article III standing. For the reasons set forth below, we agree with Plaintiffs that they plausibly allege they have standing to bring their claims but nevertheless affirm the judgment of dismissal because Plaintiffs fail to plausibly allege a violation of the First or Fourteenth Amendments.

## BACKGROUND

### I. Factual Background

On August 3, 2021, the Mayor of the City of New York announced the Key to NYC program, which provided that proof of vaccination would be mandatory for patrons and staff at various indoor businesses, including theaters, beginning on August 17, 2021. Accordingly, entities to which the program applied were required to check the vaccination status of patrons and staff and to refuse entry to individuals who could not produce proof of vaccination. Under Key to NYC, a first violation for failing to check vaccination status would subject a venue to a $1,000 fine, a second violation to a $2,000 fine, and subsequent violations to a $5,000 fine, each. A failure to comply with the mandate could have also been prosecuted as a criminal misdemeanor. The executive order announcing the program explained its purpose was to control effectively the spread of dangerous

3

new COVID-19 variants while allowing New York City to continue its economic and social recovery from the pandemic by incentivizing as many of the City's residents to get vaccinated as possible. The order noted that "the recent appearance in the City of the highly transmissible Delta variant of COVID-19 has substantially increased the risk of infection"; that "the CDC has stated that vaccination is the most effective tool to mitigate the spread of COVID-19 and protect against severe illness"; that "indoor entertainment, recreation, dining and fitness settings generally involve groups of unassociated people interacting for a substantial period of time and requiring vaccination for all individuals in these areas, including workers, will protect the public health, promote public safety, and save the lives of not just those vaccinated individuals but the public at large"; and that "mandating vaccinations at the types of establishments that residents frequent will incentivize vaccinations, increasing the City's vaccination rates and saving lives." Emergency Exec. Order 225 (Aug. 16, 2021), https://perma.cc/NR8S-PV5Q ("Exec. Order No. 225"). The order applied to "covered entit[ies]," which it defined as entities (except for schools, childcare programs, senior centers, and community centers) that operate "covered premises." *Id.* § 5(b). "Covered premises," in turn, were defined as indoor entertainment and recreational settings,

4

indoor food services, and indoor gyms and fitness settings. *Id.* § 5(c). These definitions tracked the order's focus on establishments frequented by groups of unassociated people interacting for a substantial period of time, and therefore did not include a wide variety of indoor settings, including offices, residential buildings, stores, or churches or other religious institutions.

Plaintiffs Theater Center and Actors Temple operate small venue theaters located in Manhattan. On Sunday mornings, the Jerry Orbach Theater, operated by Plaintiff Theater Center, was rented by a church, which conducted worship services there. When worship services were in progress, the Jerry Orbach Theater was not subject to the Key to NYC vaccine requirements because it was not being used as a "covered premises," although the same location was subject to the requirements when it was used as an entertainment venue. Similarly, Plaintiff Actors Temple, which was ordinarily subject to the Key to NYC requirements when it was used as a covered premises, at times "also operate[d] as a non-denominational Jewish synagogue," and when those worship services were occurring, the Key to NYC requirements did not apply. App'x 15 ¶ 14.

Plaintiffs allege that "[m]any guests come to see theatrical productions and comedy shows from outside of" New York and "struggle[d] to comply with New

5

York's mandate and to show proof of vaccination." *Id.* at 24 ¶ 53. After complying with the Key to NYC vaccine mandate, Theater Center alleges it was "required to process multiple refunds at every performance due to the mandate, even though it post[ed] prominently on its website and all social media posts that customers need to provide proof of vaccination"; that "[a]t every performance at [its] theaters since August 17, 2021, there have been angry outbursts from people who are not allowed to attend because they have either not been vaccinated or because they have forgotten, cannot find, or cannot display their proof of vaccination"; and that people have "attempted to sneak into [its] theaters using other people's vaccine cards" which "has required [it] to hire more staff to check ID cards, . . . increas[ing] costs and slow[ing] down the entry process for customers who can provide proof of vaccination." *Id.* ¶¶ 53–56. Specifics about the harms Actors Temple has suffered are absent from the complaint, though it contains the general allegation that "[e]nforcing the Key to NYC vaccine mandate has caused financial hardship, by requiring Plaintiffs to both hire more staff and process refunds for customers denied entry," and that turning away unvaccinated customers "engenders ill-will, subjects Plaintiffs to the risk of a complaint under the New York City Human

6

Rights Law, and makes it less likely that these customers will return after the restrictions are lifted." *Id.* at 25 ¶¶ 57, 59.

## II. Procedural Background

Plaintiffs filed their complaint in September 2021, pursuant to 42 U.S.C § 1983, claiming that Key to NYC violated their free speech and equal protection rights under the First and Fourteenth Amendments. They sought a declaration that "enforcement of the Key to NYC vaccine mandate against Plaintiffs' small venue theater . . . venues as compared to other similar venues violates the freedom of speech protected by the First and Fourteenth Amendments" and the Equal Protection Clause; injunctive relief prohibiting the enforcement of Key to NYC as to them; "nominal damages of one dollar for the unlawful enforcement of the Key to the NYC vaccine mandate against Plaintiffs"; and costs and attorney's fees. App'x 30–31.

Shortly after filing the complaint, Plaintiffs moved for a preliminary injunction. On December 3, 2021, the district court denied preliminary injunctive relief, finding both that Plaintiffs likely lacked standing and that they likely failed to state a claim. *See Clementine Co. v. de Blasio*, No. 21-cv-7779, 2021 WL 5756398 (S.D.N.Y. Dec. 3, 2021). Plaintiffs appealed from that order. On March 7, 2022,

however, while that appeal was pending, the City allowed the Key to NYC requirements to expire. Accordingly, this Court dismissed the appeal of the preliminary injunction as moot. *Clementine Co. v. Adams*, No. 21-3070, 2022 WL 4113100 (2d Cir. July 11, 2022).

In September 2022, the district court dismissed the underlying case as moot and for lack of standing. *Clementine Co. v. Adams*, No. 21-cv-7779, 2022 WL 4096162 (S.D.N.Y. Sept. 7, 2022). The court reasoned that the expiration of Key to NYC rendered moot Plaintiffs' claims for injunctive and declaratory relief and that the voluntary cessation exception to mootness did not apply. *Id.* at *2–3. As for the claim for nominal damages, the court explained that while it might not be moot, "Plaintiffs have not established the first element of standing—injury." *Id.* at *3. The court held that Plaintiffs "failed to allege . . . an injury-in-fact to themselves— only to potential audience members." *Id.* Plaintiffs timely appealed.

## DISCUSSION

Plaintiffs argue that the district court erred in dismissing their claims for lack of standing. The City defends the district court's standing analysis, but also argues that the court's judgment dismissing Plaintiffs' claims can be affirmed on the alternative ground of failure to state a claim. For the reasons that follow, we

8

agree with Plaintiffs that they have plausibly alleged Article III standing, but we also agree with the City that Plaintiffs' claims must nevertheless be dismissed for failure to state a claim.

## I.     Standing

Plaintiffs do not challenge the dismissal of their claims for injunctive and declaratory relief as moot. Instead, Plaintiffs argue that the district court erred in holding they lack standing to bring their claim for nominal damages. In light of recent Supreme Court precedent holding that "a request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right," *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021), Plaintiffs' claim for nominal damages is plainly not moot. But the City defends the district court's holding that Plaintiffs failed to plead an injury in fact. We disagree.

On appeal, we review *de novo* a district court's decision to dismiss a complaint for lack of standing. *Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 573 (2d Cir. 2018). "[F]or purposes of our threshold jurisdictional analysis" we must accept "plaintiffs' allegations as true and assum[e] they would be successful on the merits." *Id.* at 574. The complaint alleges that after "implementing the Key

9

to NYC vaccine mandate on August 17, 2021," the Theater was "required to process multiple refunds at every performance due to the mandate" as a result of customers who arrived unaware of the need to produce proof of vaccination. App'x 24 ¶ 54. Plaintiffs also allege that they were forced to hire additional staff to check IDs and comply with the Key to NYC requirements. These allegations plausibly allege an injury in fact. "Any monetary loss suffered by the plaintiff satisfies this element; 'even a small financial loss' suffices." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (quoting *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013)) (alterations omitted). Plaintiffs "have articulated a concrete, economic injury," which is sufficient "to establish an injury in fact for the purposes of Article III standing." *Dubuisson*, 887 F.3d at 574.[1]

---

[1] In holding otherwise, the district court incorporated by reference the standing analysis from its earlier opinion denying preliminary injunctive relief. *See Clementine Co.*, 2022 WL 4096162, at *3 (citing *Clementine Co.*, 2021 WL 5756398, at *5–16). But in doing so, the district court failed to account for the higher burden facing a plaintiff seeking preliminary injunctive relief than that applicable at the pleading stage. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Carter*, 822 F.3d at 56 (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992)). In contrast, a plaintiff's burden to demonstrate standing for purposes of a preliminary injunction is equivalent to that required for summary judgment, at which point "a plaintiff cannot rest on such mere allegations, as would be appropriate at the pleading stage." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (cleaned up); *accord New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020).

Accordingly, we hold that Plaintiffs have standing to seek nominal damages on their constitutional claims.

## II.    Sufficiency of the Complaint

Our conclusion on standing does not end the analysis, however.  We may affirm the judgment of the district court on any ground that finds a basis in the record and where, as here, the district court dismisses a complaint for lack of standing, this Court can affirm on the alternative basis of failure to state a claim even if it finds Article III's standing requirements satisfied.  *See, e.g.*, *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 107 (2d Cir. 2018); *Rothstein v. UBS AG*, 708 F.3d 82, 93–94 (2d Cir. 2013).  The City argues it is appropriate to do so here, and we agree, because Plaintiffs have not plausibly alleged a free speech claim under the First Amendment or an equal protection claim under the Fourteenth Amendment.

At the outset, we note the context of the COVID-19 pandemic in which Key to NYC was promulgated, and more specifically the then-"recent appearance in the City of the highly transmissible Delta variant of COVID-19."  Exec. Order No. 225. *Jacobson v. Massachusetts*, 191 U.S. 11 (1907), which remains good law, *see We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 293–94 (2d Cir. 2021), instructs us to

11

uphold governmental measures to protect public health unless they bear "no real or substantial relation to" the object of public health or are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." 191 U.S. at 27; *see also Norris v. Stanley*, —F. 4th —, No. 22-1200, 2023 WL 4530251, at *3–4 (6th Cir. July 13, 2023). Key to NYC plainly had a real and substantial relation to the City's public health goal of combatting the COVID-19 pandemic. And for the reasons that follow, we conclude that Key to NYC did not plainly and palpably invade fundamental rights.

Accordingly, we conclude that Plaintiffs fail to state a violation of the First or Fourteenth Amendments and affirm on that alternative ground.

## A. First Amendment

Plaintiffs argue that Key to NYC constituted a content- and viewpoint-based restriction on their speech, violating their right to freedom of speech protected by the First Amendment. The City argues that, under *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), Key to NYC did not even implicate Plaintiffs' First Amendment rights. In the alternative, the City contends that even if Key to NYC is viewed as restricting Plaintiffs' speech, it was a content-neutral regulation that survives intermediate scrutiny. We agree with the City on both points.

12

### 1. Key to NYC Did Not Implicate Plaintiffs' First Amendment Rights

*Arcara* involved a proceeding brought by the local district attorney against a defendant bookstore to enforce N.Y. Pub. Health Law §§ 2320–21, 2329, which defined "places of prostitution, lewdness, and assignation as public health nuisances" and permitted buildings found to be a public health nuisance to be closed for up to a year. 478 U.S. at 699–700. The bookstore, Village Books and News Store, was an "adult bookstore" selling "sexually explicit books and magazines." *Id.* at 698. The district attorney initiated proceedings to close the bookstore after law enforcement "observed instances of masturbation, fondling, and fellatio by patrons on the premises," as well as "instances of solicitation of prostitution." *Id.* at 699. The bookstore argued that "the statutory closure remedy impermissibly burden[ed] its First Amendment protected bookselling activities." *Id.* at 705. The New York Court of Appeals agreed. *See id.* at 701. But the United States Supreme Court rejected that argument and held that the civil proceedings that would result in the bookstore's closure did not violate the First Amendment. *See id.* at 707.

13

In the Supreme Court's view, the bookstore's free speech rights were not implicated. New York's public health law "was directed at unlawful conduct having nothing to do with books or other expressive activity." *Id.* The mere fact that the store sold books "does not confer First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises." *Id.* Thus, the Supreme Court concluded, the Court of Appeals erred in applying intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968), because that line of cases applies only if the government is regulating expressive conduct, whereas the law at issue in *Arcara* regulated indecent sexual conduct, which "manifest[ed] absolutely no element of protected expression." *Arcara*, 478 U.S. at 705.

The *Arcara* Court also distinguished its decision in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), which struck down a tax imposed on the sale of large quantities of newsprint and ink because the tax had the effect of singling out newspapers to shoulder its burden. 478 U.S. at 704. The New York Public Health Law at issue in *Arcara*, the Court reasoned, did not "inevitably single out bookstores or others engaged in First Amendment protected activities for the imposition of its burden." *Id.* at 705.

At bottom, the Supreme Court emphasized that "neither the press nor booksellers may claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities." *Id.* That is why businesses—even those engaged in expressive activity—cannot invoke the First Amendment to claim immunity from, *e.g.*, fire or health code violations. *Id.* Even the enforced *closure* of the bookstore did not impermissibly burden the store's First Amendment right to sell books because the store remained "free to carry on their bookselling business at another location, even if such locations are difficult to find," and the closure order "ha[d] nothing to do with any expressive conduct at all." *Id.* at 705 n.2.

> [E]very civil and criminal remedy imposes some conceivable burden on First Amendment protected activities . . . [,] [y]et we have not traditionally subjected every criminal and civil sanction imposed through legal process to "least restrictive means" scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction. Rather, we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in *O'Brien,* or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star. . . .* [T]he First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books.

*Id.* at 706–07 (cleaned up).

Applying *Arcara*'s logic to this case, we conclude that Plaintiffs' free speech rights are not implicated. Key to NYC was a "public health regulation of general application against the physical premises in which [Plaintiffs] happen to" perform theater. *Id.* at 707. Key to NYC "neither limit[ed] what" Plaintiffs "may say nor require[d] them to say anything." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.* ("*FAIR*"), 547 U.S. 47, 60 (2006).[2] Theaters "remain[ed] free under [Key to NYC] to express whatever views they may have" in their theatrical productions. *FAIR*, 547 U.S. at 60. In other words, Key to NYC regulated conduct, not speech. It affected what indoor theater venues "must *do*"—check the vaccination status of patrons and staff—"not what they may or may not *say*." *Id.* Nor did Key to NYC apply to Plaintiffs because of the content of their speech or the fact that they were engaging in speech at all; it applied to a wide variety of indoor venues, most of which would be hard-pressed to argue that there is any speech involved in their

---

[2] Key to NYC did require the posting of a sign in a conspicuous place informing prospective patrons of the City's vaccination requirement. Exec. Order No. 225 § 4. But Plaintiffs make no mention of this requirement nor argue that it constitutes compelled speech. In any event, such speech "is plainly incidental to [Key to NYC's] regulation of conduct." *FAIR*, 547 U.S. at 62.

16

services, such as casinos, bowling alleys, billiard halls, restaurants, and gyms. Exec. Order No. 225.

Plaintiffs attempt to distinguish *Arcara* by arguing that it "turn[ed] on sexual activity, not general health regulation," and that "the sexual activity carried on in th[at] case manifest[ed] absolutely no element of protected expression." Reply Br. 12–13 (citation omitted). In contrast, they contend, "[t]he production of a theatrical act is *pure* speech." *Id.* at 12 (citing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981)). This argument misses the point and draws the wrong parallels. The *Arcara* Court recognized that the defendant bookstore was engaged in the business of selling books—an activity entitled to First Amendment protection no less than the staging of theatrical productions. But the defendants' bookselling was not the regulatory object of the New York Public Health Law and was not the reason enforcement proceedings were brought. *See Arcara*, 478 U.S. at 707 ("The legislation providing the closure sanction was directed at unlawful conduct having nothing to do with books or other expressive activity."). Instead, the relevant statutory provisions regulated certain forms of public sexual activity: conduct, not speech. And the mere fact that the bookstore "happen[ed] to" be engaged in a business involving speech did not exempt it from "enforcement of a

17

public health regulation of general application against the physical premises" in which it was located. *Id.*

The same is true here. The laws at issue in this case and in *Arcara* both constituted broadly applicable public health measures. The Key to NYC program requiring checks of vaccination status, like the statutes in *Arcara* prohibiting public sexual activity, regulated non-expressive conduct. The plaintiff theaters here, like the defendant bookstore in *Arcara*, happen to be engaged in a business involving First Amendment–protected speech, but that alone does not entitle them to "claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities." *Id.* at 705.

In short, while we conclude that Plaintiffs plausibly allege that Key to NYC injured them in the Article III sense by necessitating refunds for customers who could not provide proof of vaccination and necessitating the hiring of additional staff, they have not plausibly alleged that their free speech rights were violated merely because they were required to turn away some patrons. The First Amendment protects the right to express one's viewpoint, but "it does not guarantee ideal conditions for doing so, since the individual's right to speech must always be balanced against the state's interest" in regulating harmful conduct.

18

*Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004). "Because 'every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities,' a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment." *Id.* (quoting *Arcara*, 478 U.S. at 706).

### 2. Key to NYC Survives Intermediate Scrutiny Even If It Were Viewed As Restricting Plaintiffs' Speech

Because we hold that Key to NYC did not implicate Plaintiffs' right to free speech, we need not address the issue of what level of scrutiny applies. But even assuming that it impaired Plaintiffs' free speech rights, we would conclude that Key to NYC does not violate the First Amendment. Key to NYC would be subject only to intermediate scrutiny — "[t]he appropriate standard by which to evaluate the constitutionality of a content-neutral regulation that imposes only an incidental burden on speech." *Vincenty v. Bloomberg*, 476 F.3d 74, 84 (2d Cir. 2007). The principal inquiry in determining whether a regulation is content-based or content-neutral "is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys." *Time Warner*

*Cable Inc. v. F.C.C.*, 729 F.3d 137, 155 (2d Cir. 2013) (citation omitted). "In making this determination, 'we look to the purpose behind the regulation.'" *Id.* (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001)). "[T]ypically, 'government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech.'" *Bartnicki*, 532 U.S. at 526 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (internal alteration and quotation marks omitted). A regulation's purpose will "often be evident on its face," but even a facially neutral regulation "may be content based if its manifest purpose is to regulate speech because of the message it conveys." *Time Warner Cable*, 729 F.3d at 155 (cleaned up). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791.

Under these standards, Key to NYC is content-neutral. Its purpose is to "incentivize vaccinations" by "mandating vaccinations at the types of establishments that residents frequent," namely "indoor entertainment, recreation, dining and fitness settings," which "generally involve groups of unassociated people interacting for a substantial period of time," in the face of the emergence of the new, "highly transmissible Delta variant of COVID-19." Exec.

20

Order No. 225.  "[B]ecause it 'serves purposes unrelated to the content of the regulated expression,'" Key to NYC "is clearly a content-neutral speech restriction."  *Mastrovincenzo v. City of New York*, 435 F.3d 78, 99 (2d Cir. 2006) (quoting *Hobbs v. County of Westchester*, 397 F.3d 133, 150 (2d Cir. 2005)) (alterations omitted).  It makes no difference that Key to NYC may have incidentally affected some speakers more than others because there is no allegation or plausible argument that Key to NYC's manifest purpose was to regulate speech because of the message it conveys.  *See id.* ("The mere fact that New York City differentiates between *categories* of vendors . . . does not suggest that the City's regulation targets particular messages and favors others.").

A content-neutral regulation that imposes incidental burdens on speech satisfies intermediate scrutiny "if it (1) 'advances important governmental interests unrelated to the suppression of free speech' and (2) 'does not burden substantially more speech than necessary to further those interests.'"  *Time Warner Cable*, 729 F.3d at 160 (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997)).  A regulation's burden is not greater than necessary "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *FAIR*, 547 U.S. at 67 (quoting *United States v.*

21

*Albertini*, 472 U.S. 675, 689 (1985)). Thus, "when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726 (2000). And where the regulation leaves open alternative channels for communicating the speech, they need not "be perfect substitutes for those channels denied to plaintiffs by the regulation at hand." *Costello v. City of Burlington*, 632 F.3d 41, 47 (2d Cir. 2011) (quoting *Mastrovincenzo*, 435 F.3d at 101).

Here, the City clearly had an important—indeed, compelling—interest in promoting vaccination to combat the spread of COVID-19. *See Kane v. De Blasio*, 19 F.4th 152, 169 (2d Cir. 2021). And this interest would have been achieved less effectively absent Key to NYC. The program was reasonably tailored to the challenge of preventing the spread of COVID-19 by incentivizing vaccination, "the most effective tool to mitigate the spread of COVID-19 and protect against severe illness." Exec. Order No. 225. And the program targeted "the types of establishments that . . . *generally involve groups of unassociated people interacting for a substantial period of time.*" *Id.* (emphasis added). Houses of worship did not fall within this category—and therefore were not covered by Key to NYC—but neither

22

were other indoor settings that generally involved groups of *associated* individuals, such as offices, residential buildings, or schools. And Key to NYC likewise did not apply to indoor facilities involving *unassociated* groups of people where those individuals *would be unlikely to interact for a substantial period of time*, whether those facilities involved speech, such as bookstores, or not, such as grocery stores. In any case, whether Key to NYC could have been tailored differently is "beside the point." *FAIR*, 547 U.S. at 67. "The issue is not whether other means of [encouraging vaccination] might be adequate," because that determination is left to the City's elected officials. *Id.* "It suffices that the means chosen . . . add to the effectiveness of" the COVID vaccination program. *Id.*

Moreover, Plaintiffs clearly continued to enjoy ample channels of communicating their speech notwithstanding Key to NYC's requirements. Plaintiffs could continue to put on the exact same productions in the exact same locations as they could have absent Key to NYC. The only limitation was that patrons who could not produce proof of vaccination could not attend in person. *See Mastrovincenzo*, 435 F.3d at 101 (holding NYC's vendor licensing regime survives intermediate scrutiny because it "in no way precludes plaintiffs from reaching public audiences on the sidewalks generally, or in any of the specific

23

venues where they currently hawk their wares" but rather "[a]t most . . . prohibits plaintiffs, as unlicensed vendors, from *personally* selling their wares *for a profit* and *at a venue of their choosing*"). And to the extent that Plaintiffs were determined to reach unvaccinated patrons, they were free to seek alternative channels of communicating, such as streaming their performances online or putting them on outdoors. Plaintiffs may have preferred to stage their plays indoors before a live audience regardless of their vaccination status, but "the First Amendment does not require that New York City permit plaintiffs to sell their work directly to the public in an ideal venue." *Id.* at 102; *Kerik*, 356 F.3d at 209 (explaining that the First Amendment "does not guarantee ideal conditions" for engaging in speech).

In short, we conclude that even if it were construed as impairing Plaintiffs' speech, Key to NYC does not violate the First Amendment.[3]

---

[3] At times in their reply brief, Plaintiffs appear to invoke a violation of the Establishment Clause, arguing that Key to NYC impermissibly favored religious speech by imposing requirements on establishments like those run by Plaintiffs but not churches or other religious entities. But because this claim was not "included in [the] complaint or raised below," we "do not address [it] further." *Littlejohn v. City of New York*, 795 F.3d 297, 324 n.23 (2d Cir. 2015).

24

## B. Equal Protection

Finally, Plaintiffs also repackage their free speech claim as an equal protection claim. They argue that Key to NYC treats theaters differently from similarly situated venues—such as houses of worship or a theatrical performance put on at a school—by requiring some venues, but not others, to check vaccination status, and that this differential treatment violates Plaintiffs' constitutional right to equal protection. We disagree and hold that Plaintiffs fail to state an equal protection claim.

The Equal Protection Clause "does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purposes for which the classification is made." *Kwong v. Bloomberg*, 723 F.3d 160, 169 (2d Cir. 2013) (quoting *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966)). In other words, "[t]he Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Accordingly, "if a law neither burdens a fundamental right nor targets a suspect class," it will be upheld "so long as it bears a rational relation to some legitimate end." *Id.*

Here, as discussed above, Key to NYC does not impair a fundamental right because it does not violate Plaintiffs' First Amendment rights. Nor does it target a suspect class—the requirements apply to indoor entertainment and recreational settings, indoor food services, and indoor gyms and fitness centers. Exec. Order No. 225 § 5(c). Accordingly, rational basis review applies. *Cf. Kane*, 19 F.4th at 167 n.14 ("When a free exercise challenge fails, any equal protection claims brought on the same grounds are subject only to rational-basis review." (quoting *Does 1-6 v. Mills*, 16 F.4th 20, 35 (1st Cir. 2021))).

"Rational basis review requires the City to have chosen a means for addressing a legitimate goal that is rationally related to achieving that goal." *Id.* at 166. The rational basis for imposing the Key to NYC requirements on indoor entertainment and recreational settings, indoor food services, and indoor gyms and fitness centers has been discussed at length above. These are locations where large numbers of unassociated individuals are likely to gather and spend significant amounts of time exposed to one another, thereby posing a relatively high risk of spreading COVID-19. Requiring individuals in those settings to be vaccinated mitigated that risk and incentivized vaccination among the people most likely to be in a position to spread the virus.

26

Accordingly, Plaintiffs have not plausibly alleged an equal protection violation.

## CONCLUSION

We have considered Plaintiffs' remaining arguments and find in them no basis for reversal. We AFFIRM the district court's dismissal of Plaintiffs' claims for failure to state a claim on which relief can be granted.[4]

---

[4] Although the district court did not specify whether its dismissal was with or without prejudice, dismissals "for lack of Article III standing . . . must be without prejudice." *Carter*, 822 F.3d at 54. Because here, we affirm on the alternative ground of failure to state a claim, we may dismiss with prejudice. *See Green v. Dep't of Educ.*, 16 F.4th 1070, 1074 (2d Cir. 2021). Although courts "granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003) (quotation marks omitted), there is no such indication here. Accordingly, the judgment of the district court is modified to specify that the dismissal is with prejudice.